# EXHIBIT A

CASE NO: 2023-10578 P

COMMONWEALTH OF PENNSYLVANIA:
COUNTY OF BEAVER

JOE DOE ETAL

                VS

HERTIAGE VALLEY HEALTH SYSTEM

ROBIN REDFERN _____ , Deputy Sheriff of BEAVER
County, Pennsylvania, who being duly sworn according to law,
says, the within COMPLAINT WITH INITIAL CA was served upon
HERITAGE VALLEY HEALTH SYSTEM INC DBA _____ ETAL the
DEFENDANT _____ , at 1025:00 Hour, on the 11th day of May _____ , 2023
at HERITAGE VALLEY HEALTH SYSTEM 1000 DUTCH RIDGE ROAD _____
BEAVER, PA 15009 _____ by handing to
REGINA PATTERSON-EXEC _____ SECRETARY _____
a true and attested copy of COMPLAINT WITH INITIAL CA together with
MANAGEMENT CONFERENCE ORDER _____

and at the same time directing Her attention to the contents thereof.

Sheriff's Costs:                    So Answers:
  Docketing              .00
  Service              26.00
  Affidavit              .00
  Surcharge            40.00        Tony Guy, Sheriff
                         .00
                       66.00        05/09/2023
                                    ATTY
                                    by
                                                    Deputy Sheriff

Sworn and subscribed to before me
this ___ day of May
         A.D.

Notary

Commonwealth of Pennsylvania - Notary Seal
Brittany N. D'amico, Notary Public
Beaver County
My commission expires April 19, 2025
Commission number 1307236

FILED OR ISSUED
2023 MAY 23 AM 9: 37
MICHAEL ROSSI
PROTHONOTARY
BEAVER COUNTY, PA

CASE NO: 2023-10578 P

COMMONWEALTH OF PENNSYLVANIA:
COUNTY OF BEAVER

JOE DOE ETAL

             VS

HERTIAGE VALLEY HEALTH SYSTEM

ROBIN REDFERN _____, Deputy Sheriff of BEAVER
County, Pennsylvania, who being duly sworn according to law,
says, the within COMPLAINT  WITH INITIAL C was served upon
HERTIAGE VALLEY MULISPECIALTY GROUP INC _____ ETAL the
DEFENDANT_____, at 1025:00 Hour, on the 11th day of May_____, 2023
at HERITAGE VALLEY MULTISPECIALTY 1000 DUTCH RIDGE ROAD_____
BEAVER, PA 15009_____ by handing to
REGINA PATTERSON-EXEC_____ SECRETARY_____
a true and attested copy of COMPLAINT  WITH INITIAL C together with
MANAGEMENT CONFERENCE ORDER_____

and at the same time directing Her attention to the contents thereof.

Sheriff's Costs:                    So Answers:
  Docketing                .00
  Service                  .00
  Affidavit                .00
  Surcharge                .00      Tony Guy, Sheriff
                           .00      05/09/2023
                           .00      ATTY
                                    by
Sworn and subscribed to before me          Deputy Sheriff
this _____ day of _____
_____ A.D.
Notary

Commonwealth of Pennsylvania - Notary Seal
Brittany N. D'amico, Notary Public
Beaver County
My commission expires April 19, 2025
Commission number 1307236

BB

MICHAEL ROSSI
PROTHONOTARY
BEAVER COUNTY PA

2023 MAY 23  AM 9: 37

FILED OR ISSUED

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

_____ BEAVER _____ County

| For Prothonotary Use Only: |
| --- |
| Docket No: 10578-2023 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Transfer from Another Jurisdiction
- ☐ Petition
- ☐ Declaration of Taking

**Lead Plaintiff's Name:** JOHN DOE, ET AL.

**Lead Defendant's Name:** HERITAGE VALLEY HEALTH SYSTEM, INC., ET AL.

**Are money damages requested?** ☒ Yes ☐ No

**Dollar Amount Requested:** (check one) ☐ within arbitration limits ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☒ Yes ☐ No

**Is this an *MDJ Appeal*?** ☐ Yes ☒ No

**Name of Plaintiff/Appellant's Attorney:** _____

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (*do not include Mass Tort*)
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability (*does not include mass tort*)
- ☐ Slander/Libel/Defamation
- ☒ Other: Pennsylvania Wire Tap Act 18 Pa. C.S.A. Section 5725

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** (*do not include Judgments*)
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:

FILED OR ISSUED 2023 MAY -1 P 2:14 MICHAEL ROSSI PROTHONOTARY BEAVER COUNTY

*Updated 1/1/2011*

FORM OF COVER SHEET FOR COMPLAINT

Court of Common Pleas of Beaver County
Civil Division
## Civil Cover Sheet

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| **PLAINTIFF'S NAME**<br>JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | **DEFENDANT'S NAME**<br>Heritage Valley Health System, Inc., d/b/a Heritage Valley Sewickley Hospital, Heritage Valley Beaver Hospital and Heritage Valley Kennedy Hospital |
| **PLAINTIFF'S ADDRESS**<br>c/o Bochetto & Lentz, P.C.,<br>1524 Locust Street, Phila., PA 19102 | **DEFENDANT'S ADDRESS**<br>1000 Dutch Ridge Road<br>Beaver, PA 15009 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME**<br>Heritage Valley Multispecialty Group, Inc. |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS**<br>1000 Dutch Ridge Road<br>Beaver, PA 15009 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |

| TOTAL NO. OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| | | X Complaint      ☐ Notice of Appeal<br>☐ Writ of Summons      ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | CASE TYPE | |
|---|---|---|
| ☐ $25,000 or Less<br><br>X Over $25,000 | ☐ Motor Vehicle<br>☐ Medical Malpractice<br>☐ Other Professional Liability<br>☐ Product Liability<br>X Other PA WIRE TAP ACT 18 Pa. C.S.A §5725 | ☐ Mortgage Foreclosure<br>☐ Ejectment<br>☐ Statutory Appeals<br>☐ Quiet Title<br><br>☐ Domestic Relations<br>   ☐ Divorce<br>   ☐ Custody |

*[Stamp: FILED OR ISSUED 2023 MAY -1 PM 3 MICHAEL ... PROTHONOTARY BEAVER COUNTY PA]*

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant; (or Pro Se Litigant)

Papers may be served at the address set forth below

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY (OR PRO SE LITIGANT)<br>George Bochetto, Esquire | ADDRESS (SEE INSTRUCTIONS)<br>1524 Locust Street, Phila., PA 19102 |
|---|---|

| PHONE NUMBER<br>215-735-3900 | FAX NUMBER<br>215-735-2455 | EMAIL ADDRESS<br>gbochetto@bochettoandlentz.com |
|---|---|---|

| SIGNATURE | SUPREME COURT IDENTIFICATION NO.<br>27783 | DATE<br>5/1/23 |
|---|---|---|

## NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5.    Cover Sheet**

(a)(1)   This rule shall apply to all actions governed by the rules of civil procedure except the following:

     (i)      actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

     (ii)     actions for support, Rules 1910.1 et seq.

     (iii)    actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

     (iv)    actions for divorce or annulment of marriage, Rules 1920.1 et seq.

     (v)     actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

     (vi)    voluntary mediation in custody actions, Rules 1940.1 et seq.

(2)     At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b)     The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c)     The prothonotary shall assist a party appearing pro se in the completion of the form.

(d)     A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e)     The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet.  The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

| | |
|---|---|
| JOHN DOE INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA |
| Plaintiff, | CIVIL ACTION - LAW |
| v. | Case No. 10578-2023 |
| HERITAGE VALLEY HEALTH SYSTEM, INC. d/b/a HERITAGE VALLEY SEWICKLEY HOSPITAL; HERITAGE VALLEY BEAVER HOSPITAL and HERITAGE VALLEY KENNEDY HOSPITAL and HERITAGE VALLEY MULTISPECIALTY GROUP, INC | |
| Defendants. | |

**JURY TRIAL DEMANDED**

FILED OR ISSUED
2023 MAY -1 P 2:14
MICHAEL ROSSI
PROTHONOTARY,
BEAVER COUNTY, PA

## NOTICE

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Beaver County Bar Association
Lawyer Referral and Information Service
788 Turnpike Street
Beaver, PA 15009
Telephone: (724) 728-4888

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparesencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requier que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Beaver County Bar Association
Lawyer Referral and Information Service
788 Turnpike Street
Beaver, PA 15009
Telephone: (724) 728-4888

| | |
|---|---|
| JOHN DOE INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiff,<br><br>    v.<br><br>HERITAGE VALLEY HEALTH SYSTEM, INC. d/b/a HERITAGE VALLEY SEWICKLEY HOSPITAL; HERITAGE VALLEY BEAVER HOSPITAL and HERITAGE VALLEY KENNEDY HOSPITAL<br>    and<br>HERITAGE VALLEY MULTISPECIALTY GROUP, INC<br><br>    Defendants. | IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA<br><br>CIVIL ACTION - LAW<br><br>Case No. 10578-23<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

---

    Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other current Citizens of the Commonwealth of Pennsylvania similarly situated ("Class Members"), brings suit against Defendants Heritage Valley Health System, Inc. and Heritage Valley Multispecialty Group Inc. (collectively Defendants or "Heritage Valley"), and upon personal knowledge as to Plaintiff's own

conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## NATURE OF ACTION AND ALLEGATIONS

1.      This case arises from Heritage Valley's systematic violation of the medical privacy rights of its patients through the use of tracking pixels (including the Meta Pixel) on their websites, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2.      Heritage Valley assures visitors to its website that:

    a.      "Your privacy is important to us at Heritage Valley Health System."

    b.      "We understand that health is a very personal, private subject, and we want you to feel as comfortable as possible."

    c.      "We do not partner with or have special relationships with any Ad Network companies. This means we do not give your information to third parties for advertising or marketing purposes."

3.      Contrary to these assurances, however, Heritage Valley does not follow these policies, nor the law prohibiting such disclosures.

4.      At all relevant times, Heritage Valley disclosed information about its patients— including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties without their patients' knowledge, authorization, or consent.

5.      Heritage Valley discloses this personal health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally discloses patients' personal health information to third parties who

exploit that information for advertising purposes. Heritage Valley's use of these tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Heritage Valley to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Pennsylvania, and both the express and implied promises of Heritage Valley.

6.     Heritage Valley's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Pennsylvania law, including, but not limited to, 18 Pa. C.S. §§5701 *et seq* (the Wiretapping and Electronic Surveillance Control Act), 28 Pa. Code § 115.27 (Confidentiality of Medical Records), 49 Pa. Code § 16.61(a)(1) (Unprofessional and Immoral Conduct), and the duty of physician-patient confidentiality recognized in *Haddad v. Gopal*, 787 A.2d 975, 980 (Pa. Super. 2001).

7.     On behalf of himself and all similarly situated citizens in the Commonwealth of Pennsylvania, Plaintiff seeks an order enjoining Heritage Valley from further unauthorized disclosures of their personal information; awarding statutory damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES TO THE ACTION

8.     Defendant Heritage Valley Health System, Inc. d/b/a Heritage Valley Sewickley Hospital, Heritage Valley Beaver Hospital, and Heritage Valley Kennedy Hospital is a Pennsylvania domestic nonprofit corporation with its principal place of business at 1000 Dutch Ridge Road, Beaver, Pennsylvania 15009. Heritage Valley Health System is a $535 million integrated delivery network providing comprehensive health care for residents of Allegheny,

Beaver, Butler and Lawrence counties in Pennsylvania.[1]  Heritage Valley Health System, Inc. includes three hospitals, Heritage Valley Sewickley, Heritage Valley Beaver, and Heritage Valley Kennedy, 55 physician offices, 21 community satellite facilities, and more than 3,800 employees and 600 physicians.[2]

9.    Defendant Heritage Valley Multispecialty Group, Inc. is a Pennsylvania domestic nonprofit corporation with its principal place of business at 1000 Dutch Ridge Road, Beaver, Pennsylvania 15009.

10.    The Defendants listed above collectively do business throughout the Commonwealth of Pennsylvania as "Heritage Valley Health System." Defendants are jointly engaged in a commercial enterprise with a common economic purpose, and the violations outlined herein were in furtherance of that common economic purpose.

11.    Plaintiff, John Doe, is a Pennsylvania citizen residing in Beaver County, Pennsylvania who has been a patient of Heritage Valley's and has utilized its website. Plaintiff Doe can be served at 1524 Locust Street, Philadelphia, PA 19102.

## JURISDICTION AND VENUE

12.    This Court has personal jurisdiction over Heritage Valley pursuant to 42 Pa.C.S.A. §§ 5301, 5308, and 5322 because the Heritage Valley Defendants regularly conduct continuous and systematic business throughout the Commonwealth of Pennsylvania, have engaged in acts that have caused harm in this Commonwealth, have violated the statutes of this Commonwealth, and/or are formed under the laws of this Commonwealth.

13.    Venue is appropriate in Beaver County pursuant to Pa R.C.P. 1006, 2156, and 2179 because the Heritage Valley Defendants' principal place of business is in Beaver County, they

---

[1] https://www.heritagevalley.org/about/overview/
[2] https://www.heritagevalley.org/about/overview/

regularly conduct business there, and, upon information and belief, many of the acts or conduct giving rise to the cause of action asserted herein took place in Beaver County. Venue is also appropriate in this Court because Plaintiff resides in Beaver County and, therefore, Heritage Valley has caused harm in Beaver County.

## FACTUAL BACKGROUND

**A.     Plaintiff's experience with Heritage Valley.**

14.    Plaintiff is a patient of Heritage Valley and has received treatment from Heritage Valley's hospital facilities, including Heritage Valley Sewickley and Heritage Valley Beaver.

15.    Plaintiff regularly uses Heritage Valley's websites and patient portal to:

      a.     find treatment options;

      b.     find suitable doctors;

      c.     order prescriptions;

      d.     communicate with his providers;

      e.     update his insurance; and

      f.     schedule appointments.

16.    Plaintiff regularly used Heritage Valley's website and patient portal during 2021, 2022, and 2023, and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff transmitted included, among other things, queries related to his treatment for lung surgery, COPD, and back pain. Plaintiff typically used Heritage Valley's patient portal as often as twice a month.

17.    Plaintiff joined Facebook in or around 2009 and has been an active user since then. He does not post information about his health or medical conditions on Facebook.

18.    Plaintiff has used Heritage Valley's website and patient portal to research and communicate about his medical conditions.

19.    Since using Heritage Valley's websites, Plaintiff has noticed targeted ads on his Facebook page related to the reasons for which he has sought medical treatment with Heritage Valley, including advertisements for allergies, lung, and respiratory issues.

**B.    Heritage Valley routinely discloses the protected health information of their patients to third parties including Facebook.**

20.    Pennsylvania courts have long recognized a "right to privacy" in the Constitution of the Commonwealth.[3] The Pennsylvania Supreme Court, in fact, has held that the Pennsylvania Constitution "provides even more rigorous and explicit protections for a person's right to privacy than does the United States Constitution."[4]

21.    Medical patients in Pennsylvania such as Plaintiff John Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Heritage Valley without their express written consent and authorization.[5]

22.    As a health care provider, Heritage Valley has fiduciary, common law, and statutory duties to keep patient data, communications, diagnoses, and treatment information completely confidential unless authorized to make disclosures by the patient.

---

[3] *See, e.g., Pennsylvania State Educ. Ass'n v. Commonwealth Dep't of Cmty. & Econ. Dev.*, 637 Pa. 337, 340, 148 A.3d 142, 144 (2016)
[4] *See id.* at 352-353 (internal quotations omitted).
[5] *See, e.g., In re T.R.*, 557 Pa. 99, 105, 731 A.2d 1276, 1279 (1999) (recognizing constitutional "right to privacy" protects a citizen's interest in "avoiding disclosure of personal matters."); *In re "B"*, 482 Pa. 471, 486, 394 A.2d 419, 426 (1978) (barring disclosure of a patient's "psychiatric records" under the constitutional right to privacy.)

23.    Patients are aware of (and must be able to reply upon) the protections, obligations, and expectations provided by statutory, regulatory, and common law as well as the promises of confidentiality contained within the Hippocratic Oath.

24.    Heritage Valley expressly and impliedly promises patients that they will maintain and protect the confidentiality of personally identifiable patient information and communications.

25.    Patients rely on these promises, obligations, and protections when seeking medical care.

26.    Patients also have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Heritage Valley without their express written consent and authorization.

27.    Heritage Valley operates the website https://www.heritagevalley.org for patients.

28.    Heritage Valley's website is designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues and treatment options, and joining support groups.

29.    Heritage Valley encourages patients to use digital tools on its website to seek and receive health services.  The home page of Heritage Valley's website is designed for use by patients, and provides patients with tools to seek treatment, such as buttons that patients can click to find a doctor, research treatments, and learn about Heritage Valley's services.

30.    Heritage Valley also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers.

31.    Notwithstanding patients' reasonable expectations of privacy, Heritage Valley's legal duties of confidentiality, and Heritage Valley's express promises to the contrary, Heritage

Valley discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Heritage Valley without patients' knowledge, authorization, or consent.    In doing so, Heritage Valley systematically violated the medical privacy rights of its patients by causing the unauthorized disclosure of patient communications to be transmitted to Facebook, Google, and other third-party marketing companies.

32.    While Heritage Valley intentionally incorporated the Meta Pixel (and other tracking pixels) into its website, Heritage Valley never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications with Facebook, Google, and others.  As a result, Plaintiff and Class Members were unaware that their private information was being surreptitiously transmitted to third parties, including Facebook and Google, when they visited Heritage Valley's website.

33.    By design, none of the tracking mechanisms employed by Heritage Valley are visible to patients visiting Heritage Valley's website.

34.    Heritage Valley did not warn or otherwise disclose to Plaintiff and Class Members that Heritage Valley bartered their confidential medical communications to Facebook, Google, and other third parties for marketing purposes.

35.    Plaintiff and Class Members never consented, agreed, or otherwise authorized Heritage Valley to disclose their confidential medical communications, particularly not beyond the limits of Heritage Valley's express promises to protect the confidentiality of Plaintiff's and Class Members' private information.

36.    Upon information and belief, Heritage Valley intercepted and disclosed the following non-public private information to Facebook:

8

a.    Plaintiff's and Class Members' status as patients;

b.    Plaintiff's and Class Members' communications with Heritage Valley via its website;

c.    Plaintiff's and Class Members' use of Heritage Valley's patient portal;

d.    Plaintiff's and Class Members' searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

37.    Heritage Valley interfered with Plaintiff's and Class Members' privacy rights when it implemented technology (including the Meta Pixel) that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential information to Facebook, Google, and other third parties.

38.    Heritage Valley also breached its obligations to Plaintiff and Class Members in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiff's and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiff and Class Members that Heritage Valley was routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Heritage Valley's common and statutory obligations to protect the confidentiality of patient's protected health information.

39.     Plaintiff and Class Members have suffered injury because of Heritage Valley's conduct.   Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**C.     The nature of Heritage Valley's unauthorized disclosure of patients' health care information.**

40.     Heritage Valley's disclosures of patients' personal healthcare information occur because Heritage Valley intentionally deploys source code on the websites it operates, including https://www.heritagevalley.org, that cause patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

41.     By design, these third parties receive and record the exact contents of patient communications before the full response from Heritage Valley to patients has been rendered on the screen of the patient's computer device and while the communication between Heritage Valley and the patient remains ongoing.

42.     For example, when Plaintiff or a Class Member accessed Heritage Valley's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers.   The information that Heritage Valley sent to Facebook included the private information that Plaintiff and Class Members communicated to Heritage Valley's website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing.   Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

43.     Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment.

10

This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer.

44.    Websites like those maintained by Heritage Valley are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

45.    Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

46.    Web browsers are software applications that allow users to exchange electronic communications over the internet.

47.    Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server.  When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

48.    In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies.  Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

49.    In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

50.    A web page consists primarily of "Markup" and "Source Code."  The markup of a web page comprises the visible portion of that web page.  Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen.  The

source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

51.    For example, typing https://www.heritagevalley.org into a browser sends an HTTP request to Heritage Valley's website, which returns a HTTP response in the form of the home page of Heritage Valley's website:



52.    Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Heritage Valley's website, to third parties via pixels.

53.    For example, Heritage Valley's website includes software code that transmits HTTP requests *directly* to Facebook, including patients' private health information, every time a patient interacts with a page on its website.

54.    The basic command that web browsers use to exchange data and user communications is called a GET request.  For example, when a patient types "heart failure treatment" into the search box on Heritage Valley's website and hits 'Enter,' the patient's web browser makes a connection with the server for Heritage Valley's website and sends the following request: "GET search/q=heart+failure+treatment."

55.    When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user.  For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

56.    The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

57.    In response to receiving a GET or POST request, the server for the entity with which the user is exchanging communications, in this case Heritage Valley's server, will send a set of instructions to the web-browser, commanding the browser with source code that (1) directs the browser on how to render the entity's response and, in many circumstances, (2) commands the browser to transmit personally identifiable data about the Internet user and re-direct the precise content of the user's GET or POST requests to various third parties.

58.    In addition to these communications between Heritage Valley and the patient, however, when a patient communicates with Heritage Valley's website (whether by typing in a

webpage, putting in a search, clicking on a hyperlink, logging into the Heritage Valley patient portal, maneuvering through the patient portal, or otherwise), Heritage Valley also causes some of that information to be transmitted to third parties without the patient's knowledge or authorization. The third parties to whom user data is transmitted and the content of communications redirected are typically procured by websites to track users' personally identifiable data and communications for marketing purposes—i.e., targeted advertising.

59.    In many such cases, the third parties acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a web bug, tracking pixel, or web beacon. These web-bugs are tiny and purposefully camouflaged to remain invisible to the user.

60.    Web bugs can be placed directly on a page by a web developer or can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom the website transmits personally identifiable user data and re-directs the content of communications.

61.    On information and belief, Heritage Valley deploys Google Tag Manager on its websites through an "iframe," a nested "frame" that exists within the Heritage Valley web properties, including inside Heritage Valley's patient portal, that is, in reality, an invisible window through which Heritage Valley funnels web bugs for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

62.    By design, none of the tracking is visible to patients who visit Heritage Valley's web properties.

63.    Once the initial connection is made between a user and a website, the communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

64.    Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties via third party tracking tools. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.

65.    Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

66.    In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

67.    Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom users' personally identifiable data and communications are transmitted without their knowledge or consent.

68.    Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

69.    Heritage Valley deploys Google Tag Manager on its website through an "iframe," a nested "frame" that exists within the Heritage Valley's website that is, in reality, an invisible window through which Heritage Valley funnels tracking pixels for third parties to secretly acquire

the content of patient communications without any knowledge, consent, authorization, or further action of patients.

70.    Heritage Valley's Google Tag Manager source code is designed to be invisible. The source code employed by Heritage Valley specifies an "iframe" with a height of 0, width of 0, display of none, and visibility hidden. Heritage Valley then funnels invisible 1x1 tracking pixels or web-bugs through this purposely invisible iframe to help third parties track, acquire, and record patient data and communications. By design, none of the tracking is visible to patients visiting Heritage Valley's website.

71.    These tracking pixels can collect dozens of data points about individual website users who interact with a website. For example, when a patient clicks through Heritage Valley's website to the page describing Heritage Valley's "Cardiology" services at https://www.heritagevalley.org/services/cardiology-2/, the source code deployed on Heritage Valley's website causes personally identifiable data and the content of patient communications to be transmitted to third parties:



72.    By design, the transmission of patient data to third parties occurs before Heritage Valley's responsive communications about "Cardiology" has been delivered in full to the patient.

73.    In addition to the Google Tag Manager, other source code is also placed on Heritage Valley's website, resulting in the interception and transmission of patient personal health information to multiple third parties.

74.    A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

75.    For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook. Tracking pixels such as the Meta Pixel tool allow Heritage Valley and Facebook to secretly track, intercept, record, and transmit every patient communication made on Heritage Valley's website.  When patients visit Heritage Valley's website, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Heritage Valley's website.  This code is triggered when a patient or visitor interacts with the web page.  Each time the Meta Pixel is triggered, the software code is executed and sends patient's private information directly to Facebook.

76.    The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed.  Instead, these pixels like in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

77.     For example, a patient can trigger an HTTP request by interacting with the search bar on Heritage Valley's website by typing a term such as "breast cancer" into the search bar and then hitting enter.  Heritage Valley's server in turn sends an HTTP response, which results in the search results being displayed.

78.     This is not the only HTTP request, however, that is created by a patient's interaction with Heritage Valley's website.  In fact, at the very same time the web page is instructed to send an HTTP request to Heritage Valley requesting search results, the embedded Meta Pixel, acting as a tap, is triggered, such that Heritage Valley's website is also instructed to send an HTTP request directly to Facebook and Google, informing them of the patient's exact search and the patient's personally identifiable information.

**D.     Tracking pixels provide third parties with a trove of personally identifiable information.**

79.     Tracking pixels are especially pernicious because they result in the disclosure of a variety of personally identifiable information.

80.     For example, an IP address is a numerical identifier that identifies each computer connected to the internet.  IP addresses are used to identify and route communications on the internet.  IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content.  IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices— one that has limited privacy controls.

81.     Because of their uniquely identifying characteristics, IP addresses are considered personally identifiable information ("PII"). 45 CFR § 164.514. Tracking pixels can (and typically do) collect website visitors' IP addresses.

82.     Whenever a Heritage Valley patient uses the Heritage Valley web properties, Heritage Valley uses and causes the disclosure of the patient's IP addresses to third parties with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the patient portal.

83.     Likewise, internet cookies are also protected personally identifiable information. 45 CFR § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

84.     In the early years of the internet, advertising on websites followed the same model as traditional newspapers.  Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

85.     Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

86.     Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

87.     Cookies are considered personally identifiable information, and tracking pixels can collect cookies from website visitors.

88.    In general, cookies are categorized by (1) duration and (2) party.

89.    There are two types of cookies classified by duration.

90.    "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie.  The user's web browser typically deletes session cookies when the user closes the browser.

91.    "Persistent cookies" are designed to survive beyond a single internet-browsing session.  The party creating the persistent cookie determines its lifespan.  As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

92.    Cookies are also classified by the party that uses the collected data.

93.    "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

94.    "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same patient who visits Heritage Valley's website will also have cookies on their device from third parties, such as Facebook and Google.  Unlike first-party cookies, third-party cookies are not typically helpful to the user.  Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

95.    Data companies like Facebook have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's

communications and habits.   To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

96.    Traditionally, first-party and third-party cookies were kept separate.  An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server.  For example, although Heritage Valley can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Heritage Valley is not permitted direct access to Facebook third-party cookie values.  The reverse *was* also true:  Facebook was not provided direct access to the values associated with first-party cookies set by companies like Heritage Valley. But Big Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

97.    JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Heritage Valley can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company.  This technique is known as "cookie syncing," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user.  Once the cookie syncing operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number.  The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

98.    In effect, cookie syncing is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies.  By designing these special third-party cookies that are set for first-party websites,

Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

99.     The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

100.     The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

101.     When Plaintiff and Class Members visited Heritage Valley's web properties, source code that Heritage Valley installed on its website—without any action or authorization by Plaintiff and Class Members—surreptitiously installed cookies such as the _fbp, _ga, and _gid cookies onto Plaintiff's and Class members' computing devices. These are cookies associated with the third-parties like Facebook and Google but which Heritage Valley deposits on Plaintiff's and Class members' computing devices by disguising them as first-party cookies.

102.     Heritage Valley engages in cookie syncing with Facebook, Google, and other third parties.

103.     Whenever a Heritage Valley patient uses the Heritage Valley website, Heritage Valley uses and causes the disclosure of patient cookie identifiers with each re-directed communication, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the Heritage Valley patient portal.

104.    Heritage Valley's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of first-party cookie values that Heritage Valley assigns to patients to be made to third parties.

105.    For example, if a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Heritage Valley with Facebook users.

106.    On information and belief, Heritage Valley requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

107.    A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

108.    A browser-fingerprint can be used to identify a device when the device's IP address is hidden, and cookies are blocked.

109.    The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify

users over time, track them across websites, and building an advertising profile of them.[6]

110.    These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google has explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites." The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

111.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.

112.    Browser-fingerprints are also considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.   Browser-fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

113.    Whenever a Heritage Valley patient such as Plaintiff uses Heritage Valley's web properties, Heritage Valley uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

---

[6] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

114.    A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is an identifiable number string that is connected to a user's Facebook profile.  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.

115.    Unique personally identifiable information such as a person's Facebook ID are likewise capable of collection through pixel trackers.

116.    Each of the individual data elements described above is personally identifiable on their own.  However, Heritage Valley's disclosures of such personally identifiable data elements do not occur in a vacuum.  The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

E.    **Facebook's Business Model: Exploiting Users' Personal Data to Sell Advertising.**

117.    Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

118.    Facebook describes itself as a "real identity" platform.  This means that users are permitted only one account and must share "the name they go by in everyday life."  To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.

119.    In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service

to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads." Facebook has since evolved into one of the largest advertising companies in the world. Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels. This allows Facebook to make inferences about users based on their interests, behavior, and connections.

120.    Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.

121.    Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

122.    Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

123.    Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences

called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

124.    Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**F.    Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

125.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

126.    One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Heritage Valley installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.

127.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks

users' activities as users navigate through a website. Once activated, the Meta Pixel "tracks the people and type of actions they take." Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website. The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website. The analytics provided by the Meta Pixel tool allow website developers to improve "website operability" by giving developers insight into how customers use and interact with companies' websites.

128.    When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and - out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws.

129.    In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law. This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

130.    The information Meta Pixel captures and disclose to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.  When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them.  Thus, the URL provides significant information regarding a user's browsing history, identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

131.    When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.  This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

132.    The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

133.    The transmission is invisible.

134.    The transmission is made without any affirmative action taken by the patient.

135.    The transmission occurs without any notice to the patient that it is occurring.

136.    Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

137.    The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it. When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

138.    These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.

139.    For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information such as IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available to be included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

140.    These communications with Facebook happen silently, without users' knowledge or consent.  By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.

141.    In exchange for installing its Meta Pixel, Facebook provides website owners like Heritage Valley with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.  The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.

142.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

143.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."

144.    Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."

145.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.

146.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as

they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website. Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

147.    Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.

148.    For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifiable data.

149.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data." HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website." Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."

150.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.

151.    Facebook has a number of ways to gather personally identifiable information from

individuals whose data is being forwarded from third-party websites through the Meta Pixel.

152.    If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

153.    Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.

154.    Facebook can also link user data to Facebook accounts through information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.  Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

155.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.  In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.

156.    Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to

33

Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

157.    Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is a means of identification that is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

158.    An unskilled computer user can obtain the c_user value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking with their mouse anywhere on the background of the page, (3) selecting 'View page source,' (4) executing a control-F function for "user=" and (5) copying the number value that immediately follows "user=" in the page source code of the target Facebook user's page.

159.    It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

160.    The datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users. Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

161.    The fr cookie is a Facebook identifier that is an encrypted combination of the c_user and datr cookies.[7]

162.    The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Heritage Valley's use of the Facebook Tracking Pixel program. The fbp cookie emanates from Heritage Valley's web properties as a putative first-party cookie, but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy.

163.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as the "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet. These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.

164.    Facebook also uses browser fingerprinting to uniquely identify individuals.  Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive.  The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address.  Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party

---

[7] *See* Gunes Acar, Brendan Van Alsenoy, Frank Piessens, Claudia Diaz, and Bart Preneel, *Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission* (March 27, 2015) (available at https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf).

website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.heritagevalley.org/, and target users with advertising based on their web activity.

**D.    Heritage Valley has discreetly embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

165.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

166.    Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites. Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

167.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

168.    Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites. Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.

169.    For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

170.    Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

171.    Heritage Valley is among the hospital systems who have embedded Meta Pixel on their websites. Via its use of the Meta Pixel, Heritage Valley intercepted and disclosed the contents of Plaintiff's and Class Members' communications with Heritage Valley, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Doctor, connect, Login, or Enroll in Heritage Valley's patient portal, summaries of Heritage Valley's responsive communications, the parties to the communications, and the existence of communications at Heritage Valley's websites

172.    For example, when a patient visits the homepage of Heritage Valley's website, the

source code employed by Heritage Valley causes personally identifiable information to be transmitted to Facebook and Google.

173.    Many of the tabs provided by Heritage Valley on its website are specific to patients—i.e., "Find a Doctor," "Pay My Bill," "Patient Activity Monitor," "Medical Records," "Patient Guide," and "Health Link Patient Portal," among others (collectively, "Patient Tabs"). Clicking on any of the Patient Tabs identifies the person using the website as a patient.

174.    For example, when a patient enters their personal information through Heritage Valley's websites that incorporate Meta Pixel, such as to locate a doctor, this information, including what the patient is being treated for, those communications are simultaneously disclosed to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

175.    This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifiable and health information is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.



176.    All this data is disclosed to Facebook simultaneously in real time as patients transmit their information, along with other data, such as a patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts.  Heritage Valley also discloses other personally identifiable information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, URLs, device identifiers, and other unique identifiable characteristics and/or codes.

177.    Heritage Valley causes similar data transmissions to be sent to Facebook and Google with every communication that a patient sends using the Patient Tabs.

178.    Heritage Valley discloses such personally identifiable information and sensitive medical information even when patients are searching for doctors on its websites to assist with conditions such as cancer or pregnancy.



39



## Search Results for: pregnancy

**Pregnancy & Infant Loss Support Group**

Help through caring. Help through information. Help through sharing. This group is facilitated by a staff member of the hospital's maternal/child patient center and comprised of parents who have lost their ...

READ MORE

**Pregnancy & Infant Loss Support Group**

Help through caring. Help through information. Help through sharing. This group is facilitated by a staff member of the hospital's maternal/child patient center and comprised of parents who have lost their ...

READ MORE

179.    When a patient sends a communication searching for more information about "pregnancy" (or any other search), Heritage Valley causes data transmissions to be made to third parties, including Facebook and Google, that include personal health information, including personally identifiable information and the content of the patient's communications.

180.    In other words, Facebook learns not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Heritage Valley is not sharing with third party marketing companies.

181.    Heritage Valley also maintains a patient portal for patients to communicate with Heritage Valley, with options to do things such as access test results, check appointments, review prescriptions, and communicate with health care providers.

182.    Heritage Valley maintains the login for its patient portal on its website located at

40

www.heritagevalley.org.



PAY MY BILL    HEALTH LINK PATIENT PORTAL

Find a Doctor    Locations    Services    Pa

🏠 > PATIENT & VISITOR RESOURCES > HEALTH LINK PATIENT PORTAL

# Health Link Patient Portal



Overview

Billing & Paym

Care Card

Download Our

Health Inform
Records)

**Health Link P**

Hearing Impai

HIPAA Privacy

Hospital Ame

Medical Staff

My Care Link

Patient Educa

Patient Guide

Pricing Transp

**Manage your health on your time with Health Link!**

Heritage Valley's Health Link is a secure online patient portal that enables you, the patient, to manage your health on your time.



### Existing Users

*If you have completed your Health Link account creation and have logged into your Health Link account.*

LOG IN NOW



### New Users

*If you need to create a new account.*

SIGN UP NOW